IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THOMAS KLAUS and ROBERT JAHODA,<br><br>Plaintiffs,<br><br>v.<br><br>DUCK HEAD APPAREL COMPANY, INC.,<br><br>Defendant. | Civil Action No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Thomas Klaus and Robert Jahoda, by and through undersigned counsel, seek a permanent injunction requiring a change in Defendant Duck Head Apparel Company, Inc. ("Defendant") corporate policies to cause its online store to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiffs respectfully assert as follows:

**INTRODUCTION**

1.  In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

    > The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at

https://www.adatitleiii.com/wp-content/uploads/sites/121/2018/10/DOJ-letter-to-congress.pdf)

(last accessed Feb. 5, 2020).

2. Thomas Klaus suffers from Leber hereditary optic neuropathy, or LHON, a genetic disorder that rendered him totally blind more than twenty years ago. He uses a screen reader to navigate the Internet.

3. Robert Jahoda suffers retinitis pigmentosa, a genetic disorder that rendered him legally blind when he was just two years old. Today, he uses screen reader technology, including VoiceOver and JAWS, to navigate the Internet.

4. Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id.*. *See* American Federation for the Blind, *Screen Readers*, available at https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed Feb. 5, 2020) (discussing screen readers and how they work).

5. Defendant is a retailer that sells apparel, accessories, and more.

6. Consumers may research and purchase Defendant's products and access other brand-related content and services at www.duckhead.com ("Website"), a website Defendant owns, operates, and controls.

7. Defendant is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

8. Unfortunately, Defendant denies approximately 8.1 million Americans who have difficulty seeing access to its online store because the Website is largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Feb. 5, 2020) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

9. Plaintiffs bring this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of their services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10. By failing to make its Website available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives individuals who are partially sighted, visually impaired, or totally blind the benefits of the goods, content, and services available in their online stores—all benefits Defendant affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11. Because Defendant's Website is not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Website to become and remain accessible, Plaintiffs invoke 42 U.S.C. § 12188(a)(2) and seek a permanent injunction requiring that:

| Compl. ¶ | Relief Requested | Defendant's Deadline to notify Plaintiff's counsel of completion |
|---|---|---|
| 11(a) | Defendant retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Website, including all third party content and plug-ins, so the goods and services on the Website may be equally accessed and enjoyed by individuals with vision related disabilities. | 30-days of Court's Order |
| 11(b) | Defendant work with the Approved Accessibility Consultant to ensure that all employees involved in website development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages. | 180-days of Court's Order and every 180-days thereafter until the Court orders otherwise |
| 11(c) | Defendant work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Website may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis. | 90-days of Court's Order and every 90-days thereafter until the Court orders otherwise |

| | | |
|---|---|---|
| 11(d) | Defendant work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to navigate, browse, and conduct business on websites, in addition to the testing, if applicable, that is performed using semi-automated tools. | 90-days of the Court's Order and every 90-days thereafter until the Court orders otherwise |
| 11(e) | Defendant incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations. | 60-days of receiving recommendations until the Court orders otherwise |
| 11(f) | Defendant work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Website, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems. | 60-days of the Court's Order |
| 11(g) | Defendant directly link from the footer on each page of the Website a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website. | 60-days of the Court's Order |
| 11(h) | Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy. | 60-days of the Court's Order |
| 11(i) | Defendant provide a notice, prominently and directly linked from the footer on each page of the Website, soliciting feedback from visitors to the Website on how the accessibility of the Website can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy. | 60-days of the Court's Order |
| 11(j) | Defendant provide a copy of the Accessibility Policy to all web content personnel, contractors responsible for | 60-days of the Court's Order |

| | | |
|---|---|---|
| | web content, and Client Service Operations call center agents ("CSO Personnel") for the Website. | |
| 11(k) | Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website. Defendant shall have trained no fewer than three of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance. | 180-days of Court's Order |
| 11(l) | Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website to be inaccessible to users of screen reader technology | 180-days of Court's Order |
| 11(m) | Plaintiff, his counsel, and its experts monitor the Website for up to two (2) years after the Approved Accessibility Consultant validates the Website is free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant. | Until the Court orders otherwise |

12. Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website will not cause the website to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., Ensuring Digital Accessibility Through Process and Policy 140 (2015). As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that

accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Website under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16 (available at https://www.browngold.com/wbcntntprd1/wp-content/uploads/BNA-Fighting-for-Accessible-Websitess-Under-ADA.pdf) (last accessed Feb. 5, 2020)

13. To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the website to remain accessible, the website must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

## JURISDICTION AND VENUE

14. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

15. Defendant attempts to, and indeed do so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website, Defendant enters into contracts for the sale of their products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *see also Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

16. As described in additional detail below, Plaintiff Jahoda was injured when he attempted to access Defendants' Website from this District but encountered barriers that denied his full and equal access to the goods, content, and services available in Defendants' online stores.

17. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

18. Plaintiff Jahoda is and, at all times relevant hereto, has been a resident of this District. Plaintiff Klaus is a resident of Harrisburg, Pennsylvania. Both Plaintiffs are and, at all times relevant hereto, have been totally blind and are therefore members of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

19.     Defendant is a Georgia corporation with its principal office address located at 546 Old Liberty Hill Rd., Toccoa, GA 30577.

## FACTS APPLICABLE TO ALL CLAIMS

20.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website developers and web content developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

## DEFENDANT'S ONLINE CONTENT

21.     Defendant's Website allows consumers to research and purchase Defendant's products from the comfort and convenience of their own homes, and arrange for home delivery into this District.

22.     Defendant is responsible for the policies, practices, and procedures concerning the Website's development and maintenance.

## HARM TO PLAINTIFF

23.     Plaintiffs attempted to access the Website using screen reader auxiliary aids, including VoiceOver with iOS.

24. "VoiceOver is a gesture-based screen reader that lets you enjoy using iPhone even if you don't see the screen. With VoiceOver enabled, just triple-click the Home button to access it wherever you are in iOS. Hear a description of everything happening on your screen, from battery level to who's calling to which app your finger is on. You can also adjust the speaking rate and pitch to suit you…You can control VoiceOver using a simple set of gestures. Touch or drag your finger around the screen and VoiceOver tells you what's there. Tap a button to hear a description, then double-tap to select. Or flick left and right to move from one element to the next.  When you interact with an element, a black rectangle appears around it so sighted users can follow along. When you prefer privacy, you can activate a screen curtain to turn off the display completely, but still hear all that VoiceOver has to say." *See* Apple, *Accessibility*, available at https://www.apple.com/accessibility/iphone/vision/ (last accessed Feb. 5, 2020).

25. Unfortunately, as a result of visiting Defendant's Website, and from investigations performed on their behalf, Plaintiffs found Defendant's Website to be largely unusable due to various barriers that deny them full and equal access to Defendants' online stores. For example:

a. The Website prevents screen reader users who navigate sequentially through content from accessing primary content directly. For example, after users activate or click the Website's menu button, Defendant displays a pop-up menu on the screen. Shoppers who perceive content visually can click various buttons in this pop-up to access additional content related to, for example, Pants and Shorts. Unfortunately, Defendant's Website requires that screen reader users tab through the unrelated elements in its underlying page before eventually scrolling to the primary content of this pop-up window. This burdensome and unnecessary interaction makes it likely that Plaintiffs will never access this menu's helpful resources.



b. Defendant's Website allows consumers to select the color of the product they wish to purchase. Defendant identifies the selected color visually, by placing a border around the color a consumer selects. Shoppers who do not rely on screen reader technology can simply click or tap the color they prefer. Unfortunately, screen readers cannot access this content. Instead, screen readers skip over the different color options, limiting Plaintiffs to the color selected by default. As a result of this particular access barrier, the options available to Plaintiffs and other screen reader users are limited to just a fraction of that otherwise available to shoppers who do not rely on screen reader auxiliary aids to shop online.



c. The Website prevents screen reader users who navigate sequentially through content from accessing primary content directly. For example, the Website provides a Size Chart that consumers may review to determine what size apparel to purchase. Size charts are particularly important to consumers who shop online because they lack the opportunity to try on products, like the products that Defendant sells, before purchasing. Unfortunately, Defendant's Website prevents Plaintiffs from tabbing to these Size Charts. Instead, their screen readers remain focused on the content of the Website's underlying pages. As a  result, Plaintiffs are unable to access the sizing information they require to confidently purchase apparel that will fit, making it likely they abandon the online shopping experience before making a purchase.

d. The Website also allows consumers to select the waist and inseam sizes of the apparel they wish to purchase. Defendant identifies the options visually, listing the available sizes in a dropdown box on the product page. Shoppers who do not rely on screen reader technology can click or tap the dropdown box to select the sizes they wish to purchase. Screen readers cannot. Instead, screen readers can only adjust the dropdown boxes so as to select the largest size they provide. Again, this access barrier limits Plaintiffs' options to just a fraction of Defendant's online store. 

e. Links and buttons on the Website do not describe their purpose. As a result, blind users cannot determine whether they want to follow a particular link, making navigation an exercise of trial and error. For example, shoppers who perceive content visually will likely recognize the Shopping Bag icon on the Website and understand that by clicking it, Defendant will redirect them to its online checkout platform. Unfortunately, this icon is not labeled. As a result, when Plaintiffs hover over it, their screen readers read the number of items in their shopping bag, only. Because this text is meaningless without additional context,  Plaintiffs are less likely to locate Defendant's online payment platform and complete a purchase successfully.

26. These barriers, and others, deny Plaintiffs full and equal access to all of the services the Website offers, and now deter them from attempting to use the Website. Still, Plaintiffs would like to, and intend to, attempt to access the Website in the future to research the products and services the Website offers, or to test the Website for compliance with the ADA.

27. If the Website were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiffs could independently research and purchase Defendant's products and access their other online content and services.

28. Though Defendant may have centralized policies regarding the maintenance and operation of their Website, Defendant has never had a plan or policy that is reasonably calculated to make its Website fully accessible to, and independently usable by, individuals with vision

13

related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

29.  The law requires that Defendant reasonably accommodate Plaintiffs' disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

30.  Plaintiffs have been, and in the absence of an injunction will continue to be, injured by Defendant's failure to maintain their online stores in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS**

31.  Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access their online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

32.  Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

33.  More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

34.  There is no DOJ administrative proceeding that could provide Plaintiffs with Title III injunctive relief.

35. While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiffs with relief.

36. Plaintiffs allege violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

37. Resolution of Plaintiffs' claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website, and (b) whether Plaintiffs can access the content and services.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

38. The assertions contained in the previous paragraphs are incorporated by reference.

39. Defendant's Website is places of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018) ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the property upon which the alleged discrimination has taken place—i.e., its website. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III.").

40. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiffs with full and equal access to their Website, it has violated the ADA.

15

41. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

42. Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

43. Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

44. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

45. By failing to provide its Website's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing,

or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

        (a)    denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website;

        (b)    affording individuals with visual disabilities access to its Website that is not equal to, or effective as, that afforded others;

        (c)    utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

        (d)    denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

        (e)    failing to make reasonable modifications in policies, practices, or procedures where necessary to afford their services, privileges, advantages, or accommodations to individuals with visual disabilities.

46.    Defendant has violated Title III by, without limitation, failing to make its Website's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website, providing them with benefits that are not equal to those they provide others, and denying them effective communication.

47.    Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website to be made available without consideration of consumers who can only access the companies' online goods, content, and services with screen reader programs.

48. Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Website nor result in making the Website different, but enables individuals with visual disabilities to access the Website Defendant already provides.

49. Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiffs and other individuals with visual disabilities.

50. Plaintiffs' claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

51. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiffs request relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for:

(A) A Declaratory Judgment that at the start of this action Defendant was in violation of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website is fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 C.F.R. § 36.504(a) which directs Defendant to take all steps necessary to bring its Website into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website is fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiffs is described more fully in paragraph 11 above.

(C) Payment of actual, statutory, and other damages, as the Court deems proper;

(D) Payment of costs of suit;

(E) Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 36.505, including costs of monitoring Defendant's compliance with the judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(F) Whatever other relief the Court deems just, equitable and appropriate; and

(G) An Order retaining jurisdiction over this case until Defendants have complied with the Court's Orders.

Dated: February 5, 2020           Respectfully Submitted,

*/s/ R. Bruce Carlson*
R. Bruce Carlson
bcarlson@carlsonlynch.com
Kevin W. Tucker
ktucker@carlsonlynch.com
**CARLSON LYNCH, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Phone: (412) 322.9243
*Counsel for Plaintiffs*